# FisherBroyles

**Robert P. Lesko**
Partner
robert.lesko@fisherbroyles.com
973-714-0340
100 Overlook Center, 2nd Floor
Princeton, NJ 08540
www.FisherBroyles.com

September 11, 2021

**VIA ECF**

Honorable Edward S. Kiel
United States Magistrate Judge for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re: Ameritas Life Ins. Corp. v. Wilmington Trust, N.A., USDCNJ no. 2:19-cv-18713

Dear Judge Kiel:

Please accept this letter on behalf of Ameritas Life Insurance Corp. in response to the September 1, 2021, correspondence from counsel for defendant Wilmington Trust, N.A., in which counsel made a number of gross mischaracterizations and reckless accusations about my conduct and that of my client that must be corrected. There is no justification for counsel's assertion that "Ameritas and/or its counsel has continuously sought to deceive both [Wilmington Trust] and the Court." An examination of the documents produced by Ameritas on August 13 in the context of the undisputed facts and circumstances of the claim makes that clear. We respectfully request Your Honor consider all of the following, which will demonstrate that the emails were not previously located and produced because: they are not part of the policy file routinely maintained by Ameritas; they are irrelevant to the claims and defenses in this matter; defendant did not make a sufficiently specific request for them, and; they were not withheld by Ameritas as Ameritas' counsel was not aware of their existence prior to August.

The additional emails that Ameritas located and produced in August are not part of any file routinely kept by Ameritas relating to a policy of insurance, and they were not contained in any part of the Bernard Sarn policy file (i.e., underwriting, client services, claims, compliance). Although Ameritas had been notified of Sarn's death by Life Equity on March 6 and sent proof of claim forms on March 13 to be completed and returned by Life Equity, Life Equity did not submit the proofs of claim to Ameritas until June 25 (received by Ameritas on June 27). No claim review commenced – nor could one have commenced – until Ameritas received the proofs of claim. The emails in questions were all generated between March 29 and April 2, 2019, months before the claim was submitted, relating to inquiries from the Claims Department to the Corporate Compliance Department and the Law Department as to whether normal claim processing should proceed when/if a claim was submitted in light of the fact that the policy had been sold by Liberty Planning, an agency that had been terminated and several of whose principals had been criminally prosecuted for STOLI fraud. These inquiries, made before the claim was submitted, were in not routine to a claim review and they were not included in the claim file.

The emails are irrelevant because they predate the New Jersey Supreme Court's ruling in *Sun Life Ass. Co. of Can. v. Wells Fargo Bank, N.A.*, 238 N.J. 157 (June 4, 2019), which changed the legal landscape for STOLI policies in New Jersey. *As of April 2, 2019*, neither Compliance nor Legal was aware of any reason why the Claims Department should not perform routine processing of the claim when and if it was submitted and they so apprised Claims. That is the sum total of what the emails reveal. And then the New Jersey Supreme Court issued its decision in *Sun Life Ass. Co. of Can.* in which the court held that

Edward S. Kiel, USMJ

September 11, 2021  |  Page 2 of 4

STOLI policies are illegal wagering contracts on human lives and are void <u>ab initio</u>.  By the time Life Equity submitted the proofs of claim on June 27, 2019, the Claims Department had obviously been apprised of the Supreme Court's decision, which led Claims to refer the matter to the Law Department on July 19, 2019.  In light of *Sun Life*, there was then, and is now, every reason not to process the claim as a routine claim because it is based on an illegal wagering contract on human life and is therefore void ab initio.  That was not the case between March 29, 2019 and April 2, 2019 when the emails at issue were generated.  Thus, the conclusions stated therein are, indeed, quite irrelevant to the claims at issue in this matter.

Nevertheless, the emails do reference Bernard Sarn or the policy insuring his life.  They are, therefore, responsive to defendant's very broad and vague document requests 1 and 2 ("Any and all documents relating to the Policy" and "Any and all documents relating to Bernard Sarn").[1]  When we located them, therefore, we produced them.  The emails were first located as part of our efforts in August to identify and log any communications in connection with the pre-litigation investigation undertaken by the Law Department because of this court's preliminary indication that such investigation is not necessarily privileged.  The efforts to log the communications were made in connection with our supplemental submission in support of the privilege assertion and to aid the court in ruling on applicability of the privilege to those documents.

Ameritas did not withhold the emails.  Ameritas could not withhold them because they were not discovered until August during the preparation of our supplemental submission.  Nor has defendant's counsel offered any reasonable basis for her accusation that Ameritas "held [the emails] hostage" or "sought to deceive both [Wilmington] and the Court."  The emails were not previously located and produced because defendant did not ask for them with any reasonable degree of specificity and Ameritas was under no obligation to search for them. (See fn.1).  In fact, Considering that the emails are neither detrimental nor even relevant to Ameritas' claims, neither Ameritas nor its counsel would even have any reason or motivation to conceal them, thus making counsel's unfounded attack all the more frivolous and reckless.

Defendant's counsel also carelessly suggests that Ameritas' supplemental privilege log served on August 13 raises questions regarding the accuracy of the privilege log.  Here again, it appears counsel's hostility has blinded them to the facts.  Counsel points to an April 2, 2019 communication between an Ameritas employee and the Law Department noted on the privilege log and falsely asserts that there is no prior communication referring the matter to legal.  In fact, among the emails that were produced on August 13 are several emails referring the matter to legal, including ALIC(s)004014, ALIC(s)004027, and ALIC(s)004033, all of which predate the April 2, 2019 email noted in the privilege log.

---

[1] Such broadly worded requests are prima facie overly broad, vague and burdensome and improper. *See Gropper v. David Ellis Real Estate, L.P.*, No. 13 Civ. 2068, 2014 U.S. Dist. LEXIS 16849, 2014 WL 518234, at *4 (S.D.N.Y. Feb. 10, 2014) (holding request for "any and all documents" inherently overbroad); *Rice v. Reliastar Life Insurance Co.*, Civ. A. No. 11-44, 2011 U.S. Dist. LEXIS 130302, 2011 WL 5513181, at *2 (M.D. La. Nov. 10, 2011) (finding that "a request for 'any and all documents' relating to a particular subject is overbroad and amounts to little more than a fishing expedition"); *Badr v. Liberty Mutual Group, Inc.*, No. 3:06CV1208, 2007 U.S. Dist. LEXIS 73437, 2007 WL 2904210, at *3 (D. Conn. Sept. 28, 2007) (finding request for "any and all" documents overly broad); *Pollard v. E.I. DuPont de Nemours & Co.*, No. 95-3010, 2004 U.S. Dist. LEXIS 6345, 2004 WL 784489, at *5 (W.D. Tenn. 2004)( "any and all" request ambiguous and overbroad).  Ameritas, therefore, appropriately objected to the requests "on the grounds that it is overly broad and burdensome insofar as it seeks 'any and all' documents 'related to' the Policy" or Sarn.

Edward S. Kiel, USMJ

September 11, 2021   |   Page 3 of 4

The fact is that we have encountered the same sort of unwarranted antagonism displayed in counsel's September 1 letter throughout the course of this litigation when discussing with defendant's counsel Ameritas' discovery positions with which defendant's counsel disagree.   We genuinely believe that if counsel could be dissuaded from such an approach, resolution of all of our disagreements and disputes would require far less attention from the court.

Meanwhile, defendant's counsel has also suggested that their submission on August 13, 2021 included supplemental authorities supporting the position that Ameritas should be compelled to produce its entire investigation file, including investigations undertaken by counsel in anticipation of this litigation.  That is a gross mischaracterization of their submission.  In fact, the only authority cited by defendant in that submission addressing privilege in the STOLI context actually supports Ameritas' position that company counsel's investigation regarding the STOLI nature of insurance policies is privileged and is NOT discoverable.  *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Tr.*, no. 09-cv-0663, 2011 U.S. Dist. LEXIS 46781 (D. Del., April 29, 2011) (cited by defendant, D.E. 73 at 4) (attached here as Exhibit A).  There, the court noted:

> [Penn Mutual] agreed to have Ms. Pedersen answer questions about the substance of Penn Mutual committee meetings, including the decisions reached and recommendations made by the committee, so long as the involvement, input, or recommendations made specifically by in-house counsel Best were not disclosed. … While this offer does not satisfy Defendants, it satisfies the Court, which finds that Defendants' broader request calls for information protected by the attorney-client privilege. Best attested that he was only acting in a legal capacity, and the record from the deposition testimony before the Court substantiates this. That Best's input could have an impact on future business does not minimize the fact that in-house counsel had made recommendations to address legal concerns with STOLI policies. See, e.g., [In re Ford Motor Co., 110 F.3d 954, 966 (3d Cir. 1997)] ("Certainly, the ultimate decision reached by the Policy and Strategy Committee could be characterized as a business decision, but the Committee reached that decision only after examining the legal implications of doing so. Even if the decision was driven . . . principally by profit and loss, economics marketing, public relations, or the like, it was also infused with legal concerns, and was reached only after securing legal advice.").
>
> \*\*\*
>
> Defendants also challenge the testimony of Best insofar as he refused to answer exactly how he identified the Reed policy as a potential STOLI policy. … Best testified that, in his role as in-house counsel, he had conducted a review of Plaintiff's life insurance policies to identify potential STOLI policies. … What Defendants seek, the specifics of his investigation, is privileged. See, e.g., Montgomery Co. v. Microvote Corp., 175 F.3d 296, 304 (3d Cir. 1999) (holding billing records to be privileged because they revealed the nature of the legal services the attorney rendered); cf. Ford, 110 F.3d at 967 (reasoning that work-product protection applied to meeting agendas because a party working backwards from them could determine the methodology of studies plaintiff had undertaken, and such studies would show "the issues of most concern" to the litigation team).

Edward S. Kiel, USMJ

September 11, 2021  |  Page 4 of 4

*Id.* at *11-13.  All of the other cases cited by defendant in its August 13 submission are inapposite.  In fact, many of them don't even discuss privileges at all!

Ameritas has presented a privilege log of all documents with respect to which it asserts privilege, including all documents generated subsequent to the July 19, 2019 referral to the Law Department based on this court's preliminary guidance relating to the privilege dispute.  Ameritas contends that all documents so identified on the privilege log and all documents generated subsequent to filing of this action prepared by counsel or in connection with counsel's investigation are protected by the attorney work product doctrine and/or the attorney client privilege.  The authorities presented by Ameritas, both in its original response to defendant's motion to compel and in its supplemental submission on August 13, support that contention.

Meanwhile, the unfounded aspersions cast by defense counsel against Ameritas and its counsel should be recognized for what they are: a not-so-subtle attempt to distract the court from Wilmington Trust's and Life Equity's immutable culpability in proceeding with the purchase of the Sarn policy despite their actual or constructive knowledge that it is illegal STOLI contract along with the potential compete loss of investment arising from their misconduct.

We appreciate the court's continuing attention to and assistance with this dispute.

Respectfully submitted,

Robert P. Lesko, Partner
FisherBroyles, LLP

c:  Katherine Skeele (via ECF)
    Jesus Cuza (via ECF)
    Rebecca Canamero (via ECF)

# EXHIBIT A

# EXHIBIT A


Neutral
As of: September 11, 2021 5:55 PM Z

# Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust

United States District Court for the District of Delaware

April 25, 2011, Decided; April 29, 2011, Filed

CIVIL ACTION NO. 09-CV-0663 (JCJ)

**Reporter**
2011 U.S. Dist. LEXIS 46781 *

PENN MUTUAL LIFE INS. CO., Plaintiff, v. RODNEY REED 2006 INS. TRUST, et al., Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Sanctions allowed by, in part, Sanctions disallowed by, in part *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust, 2011 U.S. Dist. LEXIS 46825 (D. Del., Apr. 25, 2011)*

## Core Terms

documents, attorney-client, policies, legal advice, in-house, work-product, email, deposition, Underwriting, privileged, motion to compel, legal capacity, disputed

**Counsel:** [*1] For Penn Mutual Life Insurance Company, Plaintiff, Counter Defendant: David Phillip Primack, LEAD ATTORNEY, Drinker Biddle & Reath LLP, Wilmington, DE.

For Rodney Reed 2006 Insurance Trust, Christiana Bank and Trust Company, as trustee of the Rodney Reed 2006 Insurance Trust, Defendants, Counter Claimants: David Ellis Moore, John E. James, Potter Anderson & Corroon, LLP, Wilmington, DE.

For Stephen Wechsler, Defendant: John E. James, LEAD ATTORNEY, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE; Peter Dankin, PRO HAC VICE.

For Stephen Wechsler, Counter Claimant: John E. James, LEAD ATTORNEY, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE.

**Judges:** J. CURTIS JOYNER, J.

**Opinion by:** J. CURTIS JOYNER

## Opinion

**MEMORANDUM AND ORDER**

**Joyner, J.**

Pending before the Court are Defendants' Motion to Compel (D.I. 99), Plaintiff's response in opposition thereto (D.I. 112), and Defendants' reply in further support thereof (D.I. 122). For the reasons set forth in this Memorandum, the Court grants the Motion in part, denies it in part, and reserves a ruling in part.

**I. BACKGROUND**

In this action, Plaintiff Penn Mutual is seeking a declaratory judgment that a policy of life insurance that it issued to the [*2] Rodney Reed 2006 Insurance Trust is invalid because it is a stranger-originated life insurance (STOLI) policy.

During discovery, Defendants sought information concerning Penn Mutual's investigation into, and manner of dealing with, suspected STOLI transactions. More specifically, Defendants sought information about the work of a small group of Plaintiff's senior officers that had convened for the purpose of addressing STOLI concerns, which group included Plaintiff's in-house counsel, and the investigation and review of the Reed policy undertaken by Plaintiff's in-house counsel. Plaintiff objected to certain aspects of Defendants' requests on the grounds of attorney-client privilege and/or the work-product doctrine. [1] The crux of Defendants' challenge to Plaintiff's assertion of privilege is that the in-house counsel, Franklin Best, was acting in a business capacity rather than in a legal capacity when serving on the group and when undertaking the

---

[1] The discovery presently being sought falls into three general categories: (1) responses to deposition questions that Plaintiff's witnesses refused to answer; (2) documents that Plaintiff withheld [*3] altogether; and (3) documents that Plaintiff produced but then "clawed back" on privilege grounds.

investigation into potential STOLI policies.

## II. STANDARD OF REVIEW AND GOVERNING LAW

The Federal Rules of Civil Procedure provide for the discovery of any nonprivileged matter relevant to a party's claim or defense. Fed. R. Civ. P. 26(b)(1). When a person from whom discovery is sought objects to a request, as here, on the ground of attorney-client privilege and/or work-product protection, the party seeking the discovery may move the court for an order compelling production. Id. R. 37(a).

In deciding what is subject to the attorney-client privilege, a district court exercising diversity jurisdiction must, pursuant to *Federal Rule of Evidence 501*, apply the privilege law that would be applied by the courts of the state in which it sits. Samuelson v. Susen, 576 F.2d 546, 549 (3d Cir. 1978). Delaware courts use the Restatement (Second) of Conflict of Laws and its "most significant relationship test" to determine which state's privilege law applies. In re Teleglobe Communs Corp., 493 F.3d 345, 358 (3d Cir. 2007) (quoting Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC, 832 A.2d 116, 124 (Del. Ch. Ct. 2003)); see also [*4] 3Com Corp. v. Diamond II Holdings, Inc., No. 3933, 2010 Del. Ch. LEXIS 126, at *17 (May 31, 2010). The Third Circuit has predicted, however, that "Delaware would follow the practice of the federal system and most states, and decide a choice-of-law dispute only when the proffered legal regimes actually conflict on a relevant point." In re Teleglobe, 493 F.3d at 358; see also In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997) (declining to engage in a choice-of-law analysis because the state privilege laws did "not differ in any significant way" and "[t]he elements of the attorney-client privilege [we]re well-known and . . . not, in any material respect, disputed"), abrogated in part on other grounds, 130 S. Ct. 599, 175 L. Ed. 2d 458 (2009).

Defendants assert that Pennsylvania law applies because the communications at issue took place in Pennsylvania. (Defs.' Mem. 9 n.6.) Plaintiff does not address the choice-of-law question but cites cases applying, inter alia, federal law, Delaware law, and even New Jersey law. The Court need not undergo a full choice-of-law analysis, however, because the laws of Pennsylvania and Delaware-the two states with the most significant relationships to the dispute-are similar [*5] for purposes of the issues presented in this Motion.

---

[2] In Pennsylvania, the statute governing the attorney-client privilege in civil matters provides that "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa. Cons. Stat. Ann. § 5928. Admittedly, "Pennsylvania courts have been inconsistent in expressing the scope of the attorney-client privilege," Gillard v. AIG Ins. Co., No. 10-2010, 15 A.3d 44, 2011 Pa. LEXIS 393, at *33 (Feb. 23, 2011); while some found the privilege applicable to attorney-client communications regardless of who made the communication, others held that the privilege protected "only those communications made by a client to his or her attorney" and, derivatively, "confidential communications from an attorney to his or her client . . . to the extent that such communications contain and would thus reveal confidential communications from the client." Nationwide Mut. Ins. Co. v. Fleming, 2007 PA Super 145, 924 A.2d 1259, 1264 (Pa. Super. Ct. 2007), aff'd on other grounds by an equally divided court, **605 Pa. 468, 992 A.2d 65 (Pa. 2010)**. [*6] Just recently, however, the Pennsylvania Supreme Court resolved this inconsistency, holding that, "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." Gillard, 15 A.3d 44, 2011 Pa. LEXIS 393, at *40; see also id. at *19 (recognizing that the two-way approach is "consistent with the approach of the Restatement Third").

Similarly, in Delaware,

> [a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative.

Del. R. Evid. 502(b); see also Moyer v. Moyer, 602 A.2d 68, 72 (Del. 1992) (paraphrasing the Delaware rule as applying to a "(1) communication, (2) which is confidential, (3) which was for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and his attorney" (internal quotation marks omitted)). See generally [*7] In re Teleglobe Communs Corp., 493 F.3d 345, 359 (3d Cir. 2007) ("The attorney-client privilege protects communications between attorneys and clients from compelled disclosure. It applies to any communication that satisfies the following elements: it must be (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." (quoting Restatement (Third) of the Law Governing Lawyers § 68 (2000))).

While the attorney-client privilege comes from state law in diversity cases, "[t]he work-product doctrine, codified in *Fed. R. Civ. P. 26(b)(3)*, governs all cases in federal court. State formulations of the privilege are inapplicable." *Leonen v. Johns-Manville, 135 F.R.D. 94, 96 (D. N.J. 1990)* (citing *United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 966 (3d Cir. 1988))*. Under the Rule, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." *Fed. R. Civ. P. 26(b)(3)(A)*. In the Third Circuit, "[a] document is considered to have been prepared in anticipation of litigation if 'in light of the nature [*8] of the document and the factual situation of the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Smith v. Life Investors Ins. Co., No. 07-0681, 2009 U.S. Dist. LEXIS 96310, 2009 WL 3364933, at *6 (W.D. Pa. Oct. 16, 2009)* (quoting *Martin v. Bally's Park Place Hotel Casino, 983 F.2d 1252, 1258 (3d Cir. 1993))*. "The party asserting work product protection has the burden of demonstrating that the disputed documents were prepared by or for the party or its attorney and prepared in anticipation of litigation or for trial." *Novartis Pharms. Corp. v. Abbott Labs., 203 F.R.D. 159, 163 (D. Del. 2001)*.

### III. DISCUSSION

#### A. Deposition responses

Defendants challenge the deposition testimony of Plaintiff's witnesses on the ground that the attorney-client privilege is inapplicable to (a) the investigation and conclusions of the management group, because Best was (purportedly) working in a business rather than a legal capacity, and (b) Best's investigation into potential STOLI policies, again because Best was (purportedly) working in a business rather than a legal capacity. (Defs.' Mem. 1-2, 10-11.)

It is true that when communications involve an in-house attorney, [*9] the communications must be for legal, rather than business, purposes in order to be protected. See, e.g., *SEPTA v. CareMarkPCS Health, LP, 254 F.R.D. 253, 258 (E.D. Pa. 2008)* ("The primary purpose' of the communication at issue must be 'to gain or provide legal assistance' for the privilege to apply due to the fact that 'in-house counsel may play a dual role of legal advisor and business advisor.'" (citation omitted)); 3m *Corp. v. Diamond II Holdings, Inc., No. 3933, 2010 Del. Ch. LEXIS 126, at *26-28 n.37 (May 31, 2010)* (recognizing that "advice transmitted to or offered by general counsel will not be privileged when it is 'business diction' as opposed to legal advice"); *Gillard v. AIG Ins. Co., No. 10-2010, 15 A.3d 44, 2011 Pa. LEXIS 393, at *19 n.8 (Feb. 23, 2011)* (noting the "central requirement that protected communications be for the purpose of securing or providing professional legal services" and that "the privilege does not extend to business advice").

Plaintiff has provided evidence, however, that Best was acting in his legal capacity at all relevant times. For example, Best attests in an affidavit that he is "employed as Chief Legal Officer" at Penn Mutual; that "[o]ther than serving [*10] as Secretary to the Board of Trustees and Chairman of the Penn Mutual Political Action Committee[ he] do[es] not have any business-related functions at Penn Mutual"; that he "review[s] and analyze[s] certain life insurance policies issued by Penn Mutual for the purpose of rendering legal advice to Penn Mutual"; and that his participation in the management group "was limited to the analysis of the legal implications of STOLI and rendering legal advice associated therewith." (Best Aff. ¶¶ 1, 3, 4, 11, Pl.'s Br. Ex. A.) [3]

Specifically, Defendants challenge the testimony of Kirsten Pedersen, Vice President of Operations at Penn Mutual, insofar as Pedersen refused to answer whether the group had proposed particular changes to language in Plaintiff's insurance application to protect the company from STOLI business, (Defs.' Mem. 5 (citing Pedersen Dep., Defs.' Mot. Ex. 5)), and about Best's involvement, input, or recommendations regarding STOLI policies. (Id. at 7.) Defendants acknowledge that, subsequent to the depositions [*11] in question, ==Plaintiff agreed to have Ms. Pedersen answer questions about the substance of Penn Mutual committee meetings, including the decisions reached and recommendations made by the committee, so long as the involvement, input, or recommendations made specifically by in-house counsel Best were not disclosed. (Pl.'s Br. 3-4; Defs.' Reply 5.) While this offer does not satisfy Defendants, it satisfies the Court, which finds that Defendants' broader request calls for information protected by the attorney-client privilege. Best attested that he was only acting in a legal capacity, and the record from the deposition testimony before the Court==

---

[3] More specifically, Best attests that "STOLI raises legal issues that include the violation of insurable interest laws and public policy." (Best Aff. ¶ 9, Pl.'s Br. Ex. A.)

substantiates this. That Best's input could have an impact on future business does not minimize the fact that in-house counsel had made recommendations to address legal concerns with STOLI policies. See, e.g., Ford, 110 F.3d at 966 ("Certainly, the ultimate decision reached by the Policy and Strategy Committee could be characterized as a business decision, but the Committee reached that decision only after examining the legal implications of doing so. Even if the decision was driven . . . principally by profit and loss, economics, marketing, public [*12] relations, or the like, it was also infused with legal concerns, and was reached only after securing legal advice.").

Defendants next challenge the testimony of William Nicholson, Director of Underwriting, insofar as Nicholson refused to answer certain questions about the "red flags" that the group identified as indicating a policy may be STOLI. (Defs.' Mem. 6 (citing Nicholson Dep., Defs.' Mot. Ex. 5).) Based on the deposition transcript pages provided to the Court, it appears that the witness in fact answered questions about whether certain circumstances would constitute red flags and whether certain red flags were present in the Reed application. (See Nicholson Dep. 106:5-25, Defs.' Mot. Ex. 5.) The motion to compel further responses is denied.

Defendants also challenge the testimony of Best insofar as he refused to answer exactly how he identified the Reed policy as a potential STOLI policy. (Defs.' Mem. 6-7 (citing Best Dep., Defs.' Mot. Ex. 6).) Best testified that, in his role as in-house counsel, he had conducted a review of Plaintiff's life insurance policies to identify potential STOLI policies. (Best Dep. 29:21-24, Defs.' Mot. Ex. 3.) What Defendants seek, the specifics of [*13] his investigation, is privileged. See, e.g., Montgomery Co. v. Microvote Corp., 175 F.3d 296, 304 (3d Cir. 1999) (holding billing records to be privileged because they revealed the nature of the legal services the attorney rendered); cf. Ford, 110 F.3d at 967 (reasoning that work-product protection applied to meeting agendas because a party working backwards from them could determine the methodology of studies plaintiff had undertaken, and such studies would show "the issues of most concern" to the litigation team).

To the extent that Defendants challenge Best's refusal to answer the question, "How does the legal department educate underwriters about new legal requirements?" (Defs.' Mem. 4-5 (citing Best Dep., Defs.' Mot. Ex. 5)), however, the Court agrees with Defendants that this question-concerning the method by which Plaintiff communicates information, not the substance of the information-does not call for privileged information.

## B. Production of undisclosed documents

Defendants' First Request for Production of Documents requested, among other things,

> • All documents concerning [Plaintiff's] investigation, audit or review of the Reed Policy after it was issued, or any attempts to investigate [*14] or verify any statements or answers in the Application or the Agent's Underwriting Report. (Req. No. 8.)
> • All documents concerning [Plaintiff's] decision to attempt rescission of the Reed Policy. (Req. No. 9.)
> • From January 1, 2003 until the present, all documents concerning [Plaintiff's] internal policies, underwriting guidelines, employee training manuals, contracts or memos to agents or others involved in the marketing, solicitation, underwriting, binding or delivery of [Plaintiff's] life insurance policies, marketing materials or similar guidance or criteria with respect to [STOLI policies]. (Req. No. 11.)
> • All documents concerning the development of, purpose of or drafts of the Application and any form applications from which the Application was made, including without limitation all documents concerning the development, purposes of, implementation and prior drafts or versions of Question F.4, Question 1.2, Question 1.3, Question N.3 and Question N.4. (Req. No. 14.)

(Defs.' Mem. 7-8.) Plaintiff agreed to produce all responsive, nonprivileged documents, noting in response to Request Number 11 that it would further limit its response to documents relating to the Reed policy or Reed [*15] Trust. (Id. at 8 (citing Defs.' Mot. Ex. 7).) Defendants' Motion asserts, however, that "[b]ased on the privilege log provided by Penn Mutual, it appears that Penn Mutual has also improperly withheld responsive documents relating to the working of the senior management group and Mr. Best's independent investigation on the grounds of the attorney-client and work product privileges." (Id. (citing Defs.' Mot. Ex. 8).)

As Defendants do not specify which of the approximately one hundred documents on the privilege log they are challenging, (see id.),[4] and Plaintiff has not

---

[4] Defendants seemingly rely on their attorney-client privilege argument regarding the depositions-that the documents were for business, not legal, purposes-and also argue that the work-

provided any of the documents to the Court, however, making a decision by this Court at this juncture is premature. See, e.g., *United Coal, 839 F.2d at 966* (stating that in camera review was the proper procedure for resolving privilege disputes). Thus, Defendants are to identify to Plaintiff which of the documents from Plaintiff's privilege log they are seeking, keeping in mind the Pennsylvania Supreme Court's recent holding on the scope of the attorney-client privilege and this Court's ruling on the challenges to the deposition testimony. If the parties are unable to agree on the applicability of the attorney-client privilege [*16] or work-product doctrine, Plaintiff is to submit the disputed documents for in camera inspection, after which review the Court will render a decision.

### C. Production of "clawed-back" documents

Defendants seek an email Bates-numbered PMReed-0000057, addressed to Best and copying a Jacquie Williams, which reported that the sender was attaching copies of two payments received for the Reed policy in 2009 and reiterated information about the payments. (Defs.' Mot. Ex. 12.) Plaintiff says that it is protected by the attorney-client privilege and the work-product doctrine, in that the email was sent at Best's request for the purpose of soliciting legal advice from outside counsel regarding the identity of the payor of the premium payments. (Pl.'s Br. 8 (citing Best [*17] Aff. ¶ 7).) Defendants argue that the email must be disclosed because there is no confidential information-considering that Defendant Christiana Bank was the payor-and because the email does not reveal any mental impressions or legal advice. (Defs.' Mem. 12-13.) After in camera review, this Court finds that the email is not protected from disclosure. See, e.g., *Wise Invs., Inc. v. Bracy Contracting, Inc., No. 01-3458, 2002 U.S. Dist. LEXIS 22263, 2002 WL 31955990, at *3 (E.D. Pa. Oct. 23, 2002)* ("The attorney-client privilege does not protect documents that merely describe or convey information gathered from outside sources.").

Defendants also seek a 2007 email Bates-numbered PMReed-0001089, addressed to ten recipients, including Best, that attached supplemental forms used by other insurance carriers in connection with premium finance business. (Defs.' Mot. Ex. 12.) Defendants assert that the information "comes from third parties-other insurance carriers-and cannot possibly be deemed confidential." (Defs.' Mem. 13.) Defendants add that the email "reflects no legal advice or mental impressions." (Id.) As noted supra, "[t]he attorney-client privilege does not protect documents that merely describe or convey information [*18] gathered from outside sources." *Wise, 2002 U.S. Dist. LEXIS 22263, 2002 WL 31955990, at *3*; see also *Asousa P'ship v. Smithfield Foods, Inc. (In re Asousa P'ship), No. 04-1012, 2005 Bankr. LEXIS 2373, 2005 WL 3299823, at *3 (Bankr. E.D. Pa. 2005)* ("Work product must be created by a party or its agent."). While Plaintiff asserts that it "unredacted this document and reproduced it to the Trust Defendants," (Pl.'s Br. 8), Defendants attach a document that was only partially redacted. Plaintiff must produce an unredacted version.

Finally, Defendants seek a "Policy Summary Slip" Bates-numbered PMReed-0000450-51, which summarizes facts from Plaintiff's records concerning the Reed policy. (Defs.' Mot. Ex. 12.) Defendants assert that "because it does not reflect any confidential information or attorney mental impressions, it is not privileged and should be produced." (Defs.' Mem. 12.) Plaintiff provides evidence in the form of an affidavit from Best, however, attesting that he authored this document "for the purposes of (1) soliciting legal advice from outside counsel; and (2) in anticipation of impending litigation concerning the Reed Policy" such that it is protected by attorney-client privilege and the work-product doctrine. (Best Aff. ¶ 6, [*19] Pl.'s Br. Ex. A.) After reviewing the document, the Court finds that it is protected, at the very least by the work-product doctrine. Cf. *SEPTA, 254 F.R.D. at 261-62* ("Absent specific evidence to the contrary, the Court finds that Ms. Hankins' affidavit proclaiming that the contested e-mails reveal her legal advice to her clients is sufficient to establish that they were privileged, regardless of whether or not she was the sender.").

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel is granted in part, denied in part, and a ruling reserved in part. [5]

---

product doctrine is inapplicable to this category of documents because "[t]here is no evidence that the work of the senior management group or Mr. Best's independent investigation was undertaken in response to any threat of litigation." (Defs.' Mem. 12.)

[5] In light of the fact that Defendants' Motion is only granted in part, the Court declines Defendants' request to award attorneys' fees and costs. See generally *Fed. R. Civ. P.*

**ORDER**

AND NOW, this **[*20]** 25th day of April, 2011, upon consideration of Defendants' Motion to Compel (D.I. 99), Plaintiff's response in opposition thereto (D.I. 112), and Defendants' reply in further support thereof (D.I. 122), and for the reasons set forth in the attached Memorandum, it is hereby ORDERED that Defendants' Motion is GRANTED IN PART, DENIED IN PART, and a ruling RESERVED IN PART, as follows:

1) Defendants' motion to compel responses to questions posed by Defendants at the depositions of Franklin Best, William Nicholson, and Kirsten Pedersen is

a) GRANTED to the extent that it seeks from Best the method by which the legal department educates underwriters about new legal requirements; and

b) DENIED to the extent that it seeks all other aspects of the work of Plaintiff's senior management group analyzing how to deal with STOLI transactions and the investigation of in-house counsel to identify potential STOLI policies.

2) A ruling on Defendants' motion to compel production of documents responsive to requests 8, 9, 11, and 14 of Defendants' First Request for Production is RESERVED pending in camera review of the disputed documents. Within fourteen (14) days of the entry date of this Order, Defendants **[*21]** are to inform Plaintiff which of the documents on Plaintiff's privilege log they are seeking. Plaintiff is to provide any still-disputed documents to the Court within fourteen (14) days of such notification by Defendants.

3) Defendants' motion to compel production of documents "clawed back" on privilege grounds is

a) GRANTED as to the document Bates-numbered PMReed-0000057;

b) GRANTED as to the document Bates-numbered PMReed-0001089; and

c) DENIED as to the document Bates-numbered PMReed-0000450-51.

4) Defendants' request for attorneys' fees and costs incurred in bringing the motion is DENIED.

BY THE COURT:

/s/ J. Curtis Joyner

J. CURTIS JOYNER, J.

**End of Document**

---

37(a)(5)(C) ("If the motion [to compel] is granted in part and denied in part, the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995) ("[T]he imposition of sanctions for abuse of discovery under Fed. R. Civ. Pro. 37 is a matter within the discretion of the trial court." (internal quotation marks omitted)).

Jill Guldin