# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**AMERITAS LIFE INSURANCE CORP.,**

       **Plaintiff,**

**v.**

**WILMINGTON TRUST, N.A., as Securities Intermediary,**

       **Defendant.**

Civ. No. 19-18713 (KM) (ESK)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Ameritas Life Insurance Corp. ("Ameritas") initiated this action (DE 1)[1] for declaratory relief, alleging that a life insurance policy it issued, currently owned by defendant Wilmington Trust, N.A. ("Wilmington"), is a stranger-originated life insurance policy and is therefore void under New Jersey law. In its answer, Wilmington asserted 9 affirmative defenses and 7 counterclaims. (DE 11.)

Ameritas responded with a motion for partial judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and a motion to strike pursuant to Fed. R. Civ. P. 12(f) (DE 100-1), both of which are now before the court. Ameritas seeks

---

[1]     For ease of reference, certain key items from the record will be abbreviated as follows:

    DE = Docket entry in this case

    Compl. = Ameritas's complaint (DE 1)

    Ans. = Wilmington's answer (DE 11)

    Mot. = Ameritas's memorandum of law in support of its motion for judgment on the pleadings and motion to strike (DE 100)

    Opp. = Wilmington's memorandum of law in opposition (DE 112)

    Decl. = Declaration of Katherine A. Skeele in support of Wilmington's opposition (DE 113)

judgment on the pleadings as to all but one of Wilmington's counterclaims and seeks to strike all but two of the asserted affirmative defenses. For the reasons set forth below, the motion to strike is **GRANTED** and the motion for partial judgment on the pleadings is **GRANTED** in part and **DENIED** in part.

## I.    Background

### A. Facts

I recite the facts presented in the pleadings, drawing all reasonable inferences in favor of Wilmington for the purposes of the motion for judgment on the pleadings. *See EP Henry Corp. v. Cambridge Pavers, Inc.*, 383 F.Supp.3d 343, 348 (2019).

Ameritas is a Nebraska corporation with its principal place of business in Nebraska and Ohio. (Compl. ¶6.) Wilmington is a Delaware corporation with its principal place of business in Delaware. (Compl. ¶7.)

On July 20, 2007, Union Central Life Insurance Company[2] issued a $5 million policy insuring the life of Bernard Sarn ("the policy"), who was then 76 years old. (Compl. ¶¶1, 6.) At the time the policy was issued, the owner and beneficiary of the policy was identified as The Bernard Sarn 2007 Insurance Trust ("the trust"), and the trust identified Sarn's children as its beneficiaries. (Compl. ¶15.) The initial and planned periodic premium for the policy at the time of issuance was $251,478.34. (Compl. ¶14.) The policy contains an incontestability clause, which states that the insurer will not contest the validity of the policy after it has been in force for two years from the issue date during the insured's lifetime. (Compl. ¶18, Decl. 12.)[3]

On or about October 30, 2009, just over two years after the policy was issued, Sarn's stepson, who was the trustee of the trust (Opp. 11.), executed a

---

[2]    Ameritas asserts that it is the successor in interest to Union Central Life Insurance Company. References to Ameritas should be understood to include its predecessor.

[3]    New Jersey law mandates all contracts for life insurance policies include an incontestability clause that takes effect two years after the policy's issuance while the insured is alive. *See* N.J. Stat. Ann. § 17B:25-4.

"Policyowner's Change and Service Request." (Compl. ¶18.) Per the request, the owner and beneficiary of the policy, formerly the trust, was changed to EEA Life Settlements Master Fund, Ltd. (c/o ViaSource Funding Group, LLC). (Compl. ¶18.) The policy was later sold to Geronta Funding Trust ("Geronta") on or about September 25, 2015, at which point Geronta became the owner and beneficiary of the policy. (Compl. ¶21.) On January 2, 2019, the owner and beneficiary of the policy changed to the current owner, Wilmington.[4] (Compl. ¶22.)

Sarn died on February 7, 2019. (Compl. ¶23.) On June 25 of that year, Wilmington submitted a claim for payment under the policy to Ameritas, the insurer, but Ameritas did not pay the claim. (Ans. ¶16.) Instead, Ameritas commenced an investigation into the claim (Compl. ¶ 24-25), and eventually initiated this action for declaratory relief.

### B. Procedural history

Ameritas filed its complaint on October 4, 2019. (DE 1.) In the complaint, Ameritas states that it "is informed and believes that the Policy was procured or caused to be procured by strangers to Bernard Sarn without a valid insurable interest in his life." (Compl. ¶2.) More specifically, Ameritas alleges that, at the time the policy was issued, Sarn and the trustee "expected and intended that the Policy would be transferred to strangers who did not possess a valid insurable interest in Sarn's life in exchange for value to be paid or already paid at the time of issuance." (Compl. ¶3.) Ameritas also alleges that "the initial premium and subsequent premiums were funded with money deposited into the trust's account or otherwise provided by stranger investors." (Compl. ¶17.) Thus, as its sole count, the complaint seeks a declaratory judgment as to whether the policy is valid and enforceable, or whether it is a stranger-originated life insurance policy and is therefore void at the outset

---

[4]     Wilmington asserts that, at all times, it acts solely as the securities intermediary for the benefit of Geronta, a Delaware statutory trust, and does not act in its individual capacity. I will accept this assertion for the purposes of the present motion.

(Compl. ¶32.) If the policy is declared void *ab initio*, Ameritas requests that the court also enter judgment as to whether Ameritas is obligated to repay premiums that policyholders paid for the policy. (Compl. ¶32.)

Wilmington filed its answer on March 4, 2020. (DE 11.) The answer asserts nine affirmative defenses: (1) failure to state a claim; (2) unclean hands; (3) recoupment of all premium payments if the policy is found to be void; (4) bad faith denial of insurance proceeds without a reasonable basis; (5) equitable estoppel; (6) incontestability of the policy; (7) laches; (8) waiver; and (9) good-faith purchase for value.

Wilmington also raises seven counterclaims. Counterclaim Count I seeks a declaration that (a) the policy is valid and enforceable; (b) Ameritas is precluded from contesting the validity of the policy under the incontestability provision; (c) Ameritas is estopped from contesting the validity of the policy in light of various representations, demands, and promises; and (d) Ameritas must return all premiums collected on the policy if the policy is declared void. Counterclaim Counts II through VII allege breach of the covenant of good faith and fair dealing; breach of contract; unjust enrichment; bad faith denial of insurance proceeds; promissory estoppel; and negligent misrepresentation.

Ameritas filed the current motions on February 11, 2022. (DE 100-1.) Ameritas seeks a motion for judgment on the pleadings with respect to the affirmative defenses of unclean hands, bad faith denial of insurance proceeds without a reasonable basis, equitable estoppel, incontestability of the policy, laches, waiver, and good faith purchase for value. Alternatively, Ameritas moves to strike these affirmative defenses. Ameritas also seeks a motion for judgment on the pleadings with respect to counterclaims Count I (declaratory judgment), Count II (breach of the covenant of good faith and fair dealing), Count III (breach of contract), Count V (bad faith denial of insurance proceeds), Count VI (promissory estoppel) and Count VII (negligent misrepresentation).

## II.     Legal standards

### A. Motion for judgment on the pleadings

Federal Rule of Civil Procedure Rule 12(c) provides for judgment on the pleadings after the pleadings have been closed. A motion for judgment on the pleadings will be granted "if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law. The court will accept the complaint's well-pleaded allegations as true, and construe the complaint in the light most favorable to the nonmoving party, but will not accept unsupported conclusory statements." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262-263 (3d Cir. 2008) (internal citations omitted). For present purposes, the standards governing a Rule 12(c) motion and a Rule 12(b)(6) motion are similar. *See Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).

On a Rule 12(b)(6) motion to dismiss, the factual allegations in the nonmoving party's pleading must be sufficient to raise the party's right to relief above a speculative level, demonstrating that it is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This entails "plead[ing] factual content that allows the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### B. Motion to strike

Federal Rule of Civil Procedure Rule 12(f) provides, in relevant part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). "An affirmative defense is insufficient if it is not recognized as a legal defense to the cause of action." *Huertas v. U.S. Dep't of Educ.,* No. 08-3959, 2009 WL 2132429, at *1 (D.N.J. July 13, 2009). "Striking legally insufficient defenses saves time and expense by making it unnecessary to litigate defenses that will not affect the outcome of the case." *Id.*

However, because motions to strike require the court to evaluate legal issues before the factual background of a case has been developed, courts

generally disfavor such motions. *See United States v. Sensient Colors, Inc.,* 580 F.Supp.2d 369, 374 (D.N.J.2008). "Thus, a motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact." *Huertas*, 2009 WL 2132429, at *1. "A court should grant a motion to strike a defense only where the 'insufficiency of the defense is clearly apparent.'" *Id.*, quoting *Sensient*, supra at 374.

### III.  Discussion

This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) based upon the diversity of citizenship of the parties and the amount in controversy exceeding $75,000. Where jurisdiction is based upon diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).

Both parties have assumed that New Jersey law governs the dispute at hand. Seeing no clear reason to deviate from the parties' assumptions, and in light of the fact that, at the time the policy was applied for, both Sarn and the trust were domiciled in the state of New Jersey, and Sarn lived in New Jersey until the time of his death, the court will apply New Jersey law. (Compl. ¶10-11.) *See Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the . . . claims as though New Jersey substantive law applies, the Court will assume that to be the case."), citing *USA Mach. Corp. v. CSC, Ltd.,* 184 F.3d 257, 263 (3d Cir. 1999). *See also Columbus Life Ins. Co. v. Wilmington Trust, N.A.*, No. 20-7959, 2021 WL 1712528, at *3 (D.N.J. Apr. 30, 2021) (applying New Jersey law to dispute over validity of life insurance policy where parties agreed that New Jersey law governs).

### A. New Jersey law on stranger-originated life insurance policies

I will first provide a brief summary of New Jersey law on stranger-originated life insurance policies.

At the time a life insurance policy is issued, the policy benefits must be made payable to a person with an insurable interest in the life of the insured. *See* N.J. Stat. Ann. § 17B:24-1.1(b).[5] An individual has an insurable interest in his own life or the life of a close blood relation, and also where there exists "an expectation of pecuniary advantage through the continued life" of the insured person. *See* N.J. Stat. Ann. § 17B:24-1.1(a). Insurable interest requirements in New Jersey and elsewhere operate to prevent situations where the policy owner has no personal interest in the continued life of the insured and instead treats the policy as a wager. *See Grigsby v. Russell*, 222 U.S. 149, 154, 1911.

There is a loophole. Where the insurable interest requirement was met at the time of the policy's issuance, New Jersey law permits a life insurance policy to be sold or otherwise transferred to a person who lacks an insurable interest. *See Lincoln Nat. Life Ins. Co. v. Calhoun*, 596 F.Supp.2d 882, 889 (D.N.J. 2009). "Insureds begin to run afoul of the insurable interest requirement, however, when they intend <u>at the time of the policy's issuance</u>, to profit by transferring the policy to a stranger with no insurable interest at the expiration of the contestability period." *Id.* (Emphasis added.) Such policies have come to be known as "stranger-originated life insurance" policies, or "STOLI" policies.

In a decision issued on June 4, 2019, the Supreme Court of New Jersey declared that STOLI policies violate the public policy of New Jersey and are therefore void *ab initio. See Sun Life Assurance Company of Canada v. Wells Fargo Bank, N.A.*, 238 N.J. 157 (N.J. 2019). In that case, which I will refer to as "*Sun Life*," the initial owner and beneficiary of the policy at issue was a trust, and the grandson of the insured was the trustee. *Id.* at 161. The trust had four additional members, all of whom were strangers to the insured, and the investors deposited money into the trust account to pay for most if not all of

---

[5]    "No person shall procure or cause to be procured any insurance contract upon the life, health or bodily safety of another individual unless the benefits under that contract are payable to the individual insured or his personal representative, or to a person having, at the time when that contract was made, an insurable interest in the individual insured.")

the policy's premiums. *Id.* Five weeks after the policy was issued, the insured's grandson resigned as trustee and appointed the four stranger investors as co-trustees. *Id.* at 162. Over two years later, once the contestability period had expired, the investors sold the policy to a life settlements company, and it was then sold again before Wells Fargo purchased it, several years before the insured's death. *Id.*

The New Jersey Supreme Court characterized the arrangement as a STOLI transaction and held that such STOLI policies "run afoul of New Jersey's insurable interest requirement and are against public policy." *Id.* The court explained that "[i]t would elevate form over substance to conclude that feigned compliance with the insurable interest statute—as technically exists at the outset of a STOLI transaction—satisfied the law." *Id.* at 160. "Such an approach," the Court observed, "would upend the very protections the statute was designed to confer and would effectively allow strangers to wager on human lives." *Id.* The Court also clarified that STOLI policies are void *ab initio*, rather than voidable, because "[w]hen an insurance policy violates public policy, it is as though the policy never came into existence." *Id.* at 187, citing *D'Agostino v. Maldonado*, 216 N.J. 168, 194 n.4 (2013) ("A void contract is a contract that is of no legal effect, so that there is really no contract in existence at all.") (cleaned up).

Following the *Sun Life* decision, the New Jersey legislature enacted a statute prohibiting STOLI transactions and declaring STOLI policies "void and unenforceable at the outset." *See* N.J. Stat. Ann. § 17B:30B-18. The statute dictates that "[a] trust that is created to give the appearance of an insurable interest and that is used to initiate or procure policies for investors shall be in violation of the insurable interest laws of this State and the prohibition against wagering on life." *Id.* Moreover, the statute provides that a life insurer may contest a life insurance policy on the grounds that it is a STOLI policy at any time, notwithstanding the existing statutory requirement that all life insurance

policies have an incontestability clause that takes effect two years after the policy's issuance while the insured is alive. *See id.*; N. J. Stat. Ann. 17B:25-4.

### B. Wilmington's affirmative defenses

As mentioned above, Ameritas seeks a motion for judgment on the pleadings with respect to the affirmative defenses of unclean hands, bad faith denial of insurance proceeds without a reasonable basis, equitable estoppel, incontestability of the policy, laches, waiver, and good faith purchase for value. Alternatively, Ameritas has moved to strike these defenses.

As a threshold matter, I note that a motion for judgment on the pleadings is technically not the proper vehicle to challenge some but not all affirmative defenses raised by Wilmington. Rather, "'a plaintiff seeking to dispute the legal sufficiency of fewer than all of the defenses raised in the defendant's pleading . . . should proceed under Rule 12(f) rather than under Rule 12(c) because the latter leads to the entry of a judgment.'" *Barry v. DePuy Synthes Prod., Inc.*, No. 17-3003, 2020 WL 10457864, at *3 (E.D. Pa. Oct. 21, 2020), quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1369 (3d ed. Apr. 2020). Accordingly, Ameritas's challenge is more appropriately styled as a motion to strike.

As an additional threshold issue, it appears that Ameritas's motion to strike is untimely. Federal Rule of Civil Procedure 12(f) provides that a party may file a motion to strike "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." *See* Fed. R. Civ. P. 12(f)(2). Wilmington's answer, which raises the counterclaims, was filed on March 4, 2020. (DE 11.) Ameritas filed its answer to the counterclaims on May 21, 2020, but did not move to strike the counterclaims until February 11, 2022. (DE 100.)

Nonetheless, Rule 12(f) allows the court to act on its own to strike any insufficient defenses at any time. *See* Fed. R. Civ. P. 12(f)(2). For the sake of efficiency, and given that many of the challenged affirmative defenses are

grounded in the same legal theories as the challenged counterclaims, I will consider the legal sufficiency of the counterclaims at issue.

### i.    Unclean hands, equitable estoppel, laches, and waiver

"The 'essence' of the equitable doctrine of unclean hands 'is that a suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.'" *Columbus Life Ins. Co.*, 2021 WL 1712528, at \*5, quoting *Borough of Princeton v. Bd. of Chosen Freeholders*, 777 A.2d 19, 32 (N.J. 2001). The doctrine is discretionary on the part of the court and may be invoked when it appears that the claimant itself has engaged in misconduct connected with the relief it seeks. *See In re New Valley Corp.*, 181 F.3d 517, 525 (3d Circ. 1999).

Laches is another equitable doctrine that operates to "preclude[ ] relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party." *See Columbus Life Ins. Co.*, 2021 WL 1712528, at \*4, quoting *Fox v. Millman*, 45 A.3d 332, 341 (N.J. 2012). Similarly, the doctrine of waiver prevents a party that has intentionally relinquished or abandoned its rights from asserting them, *see Leboon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 225 (3d Cir. 2007), while "[e]quitable estoppel applies when one party rightfully relies on an intentional or negligent representation of fact by another party, who is estopped from later denying that representation because the relying party would be injured." *See In re Price*, 361 B.R. 68, 78 (Bankr. D.N.J. 2007), citing *In re RFE Indus., Inc.* 283 F.3d 159, 164 (3d Cir. 2002).

By raising each of these defenses, Wilmington seeks to bar Ameritas from challenging the validity of the policy, even if the policy is ultimately found to be illegal under New Jersey law. As a general rule, however, "[a] contract which is void *ab initio*, or void from the beginning, may not be enforced." *First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 242 (N.J. 2003) (LaVecchia, J., dissenting) (internal quotation marks omitted). Consequently, equitable defenses are beside the point. "'[J]udicial or equitable doctrines cannot breathe life into such

a contract' given that 'courts treat the contract as if it has never been made.'"
*Id.*, quoting *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d
283, 292-93 (Mass. 1991).

In *Columbus Life Ins. Co.*, this court granted a motion to strike the
affirmative defenses of unclean hands, waiver, estoppel, and laches, which
were asserted by a life insurance policyholder against an insurer seeking a
declaratory judgment that the policy at issue was void as a STOLI policy. 2021
WL 1712528, at *4-5. In doing so, the court relied on the invalidation of such
contracts in *Sun Life*:

> "STOLI contracts are void from the outset. As a result, if the Policy here
> is ultimately determined to be a STOLI arrangement, the equitable
> defenses of laches, waiver and estoppel, and unclean hands cannot be
> asserted to sustain the Policy. In other words, if Columbus proves that
> the Policy is a STOLI contract, then the affirmative defenses will not be
> available to Wilmington. But if Columbus does not prevail, then the
> affirmative defenses will be unnecessary. Because the affirmative
> defenses cannot bar Columbus's claim for declaratory judgment on the
> grounds that the policy is void *ab initio*, the defenses are legally
> insufficient under any set of facts which may be inferred from the
> allegations to support the pleading."

*Id.* (Internal quotation marks omitted.) In line with the court's decision in
*Columbus Life Ins. Co.*, I find that, as raised here, the affirmative defenses of
unclean hands, equitable estoppel, laches, and waiver are legally insufficient.
These defenses are either unavailable to Wilmington in the event that the policy
is void, or they are superfluous in the event that it is not. For that reason, the
defenses of unclean hands, equitable estoppel, laches, and waiver will be
struck.

### ii.   Incontestability provision

Wilmington's affirmative defense based on the incontestability clause of
the policy likewise lacks legal sufficiency. Although the policy's two-year
contestability period expired long ago, the New Jersey legislature has explicitly

provided that a life insurer may contest a life insurance policy on the grounds that it is a void, STOLI policy at any time. *See* Stat. 17B:30B-18. Thus, the incontestability clause is not a bar to Ameritas's claim for declaratory relief. *See Lincoln Nat. Life Ins. Co. v. Schwarz*, No. 09-03361, 2010 WL 328550, at *9-11 (D.N.J. Aug. 18, 2010) (denying motion to dismiss claim for recission of alleged STOLI policy on grounds of policy's incontestability clause). I will therefore strike this affirmative defense from Wilmington's answer.

### iii. Good faith purchaser for value

Wilmington asserts that it was "a good-faith purchaser of a financial asset for value under New Jersey's UCC" as an affirmative defense to Ameritas's claim for relief. (Ans. 6.) *See* N.J. Stat. Ann. § 12A:8-502. I will strike this defense for the same reason that I am striking the defenses of unclean hands, equitable estoppel, laches, and waiver: this defense "is legally insufficient under any set of facts which may be inferred from the allegations to support the pleading." *See Columbus Life Ins. Co.*, 2021 WL 1712528 at *5.

If the policy is found to be a STOLI policy and therefore contrary to the public policy of New Jersey, it cannot be enforced, regardless of whether Geronta was a bona fide purchaser. *See Vasquez v. Glassboro Serv. Ass'n*, 83 N.J. 86, 98 (N.J. 1980) ("No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good."); *Hebela v. Healthcare Ins. Co.,* 851 A.2d 75, 80 (N.J. Super. Ct. App. Div. 2004) ("[O]ur courts will decline to enforce an insurance policy, like any other contract, if its enforcement would be contrary to public policy.") On the other hand, if the policy is found to be valid, the asserted defense will be unnecessary, as Wilmington will be entitled to the death benefits it seeks irrespective of Geronta's good faith, or not, in purchasing the policy.

### iv. Bad faith denial of insurance proceeds

The last affirmative defense Wilmington raises is that Ameritas's claims are barred because it has engaged in a bad faith denial of insurance proceeds without any reasonable basis. (Ans. 6.) As I will further explain below in the

discussion of Wilmington's breach of contract claim, Ameritas has not denied Wilmington's claim for death benefits. Rather, Ameritas seeks a declaration from this court as to *whether* the policy is valid, so that Ameritas can determine *whether* it is obligated to pay the benefits owed under the policy. Thus, in the circumstances here, bad faith denial is not a cognizable defense to Ameritas's claim for declaratory relief. *See Lincoln Nat. Life Ins. Co.*, 2011 WL 2357828, at *6 (granting plaintiff insurer's motion to dismiss counterclaim for bad faith denial where insurer had filed lawsuit related to the policy but had not denied claim for benefits outright). I will therefore strike the defense of bad faith denial of insurance proceeds from Wilmington's answer.

### C. Wilmington's counterclaims

#### i. Declaratory relief

Wilmington's first counterclaim has four subparts. Wilmington seeks a declaration that (a) the policy is valid and enforceable; (b) Ameritas is precluded from contesting the validity of the policy under the incontestability provision; (c) Ameritas is estopped from contesting the validity of the policy in light of various representations, demands, and promises; and (d) Ameritas must return all premiums collected on the policy if the policy is declared void. (Ans. ¶20.) Ameritas argues that this counterclaim fails as a matter of law because it "seek[s] judicial enforcement of the Policy via equitable and legal doctrines in the event that the Court finds that the Policy is void *ab initio.*" (Mot. 12.)

I agree with Ameritas and will grant the motion for judgment on the pleadings as to certain subparts of counterclaim Count I on which Wilmington cannot prevail as a matter of law. In particular, I will grant judgment on the pleadings as to subpart (b) of counterclaim Count I because, as discussed above, the incontestability provision does not bar a challenge to a life insurance policy on the grounds that it is a STOLI policy, and I will grant judgment on the pleadings as to subpart (c) of counterclaim Count I because, as also discussed above, the doctrine of estoppel cannot be applied to require enforcement of a void STOLI policy. Ameritas's motion for judgment on the pleadings is denied as to subpart (a), Wilmington's request for a declaration that the policy is valid

and enforceable, and subpart (d), Wilmington's request for a declaration that Ameritas must return all premiums collected if the policy is declared void.

### ii. Breach of contract

Wilmington's breach of contract counterclaim (Count III) asserts that Ameritas "breached its promises and obligations under the Policy by . . . (a) [r]enouncing its contractual obligation to pay the death benefit under the Policy[, and] (b) [c]ontesting the validity of the Policy even though the Policy is beyond the two-year contestability period and premiums are current." (Ans. ¶35.)

"In order to plead a breach of contract claim, a plaintiff [for which read Counterclaimant Wilmington] has to allege sufficiently the following elements: (1) a valid contract existed between the parties; (2) defendant breached the contract; (3) plaintiff performed its obligations under the contract; and (4) plaintiff incurred damages as a result of the breach." *Lincoln Nat. Life Ins. Co.*, 2011 WL 2357828, at *3. Wilmington's claim fails because it cannot properly plead the second element—that Ameritas has breached its contract regarding the policy.

In *Lincoln Nat. Life Ins. Co.*, 2011 WL 2357828, at *3, this court held that a plaintiff insurer's filing of an action for declaratory judgment as to its rights and obligations under a life insurance policy did not amount to a breach of contract under the policy. The court joined "with numerous courts, albeit construing different state laws, which have held that 'an action for declaratory judgment does not indicate an unconditional refusal to comply with contractual obligations, but rather an attempt to carry them out.'" *Id.*, quoting *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust.*, 674 F.Supp.2d 562, 566 (D. Del. 2009). Ameritas, like the plaintiff in *Lincoln Nat. Life Ins. Co.*, has sought judicial intervention to assess the validity of the policy. And, like the plaintiff in that case, Ameritas has not stated that it will refuse to pay the benefits owed on the policy if this court ultimately determines that the policy is valid. Consequently, Wilmington fails to state a claim for breach of contract on

the grounds that Ameritas has not already paid out the death benefits requested.

Nor has Wilmington sufficiently pled a breach of contract claim arising out of Ameritas's violation of the incontestability provision. Once again, New Jersey law makes clear that an insurer may contest a life insurance policy on the grounds that it is a STOLI policy at any time. *See* N.J. Stat. Ann. § 17B:30B-18. Ameritas's motion for judgment on the pleadings as to Count III of the Counterclaim in Wilmington's answer is therefore granted.

### iii.   Breach of the covenant of good faith and fair dealing

In Count II of its counterclaim, Wilmington alleges that Ameritas has breached the covenant of good faith and fair dealing that is implicit in the policy. To be specific, Wilmington asserts that Ameritas breached the implied covenant by filing a "frivolous and baseless" complaint "without any evidence to support its position." (Ans. ¶27.) In addition, Wilmington asserts that the purported facts on which Ameritas bases its challenge to the policy, to the extent that they are accurate, have been in existence for years, and certainly before the policy was transferred to Geronta. Nonetheless, Ameritas "chose to ignore those alleged facts in order to continue collecting millions of dollars in premium payments." (Ans. ¶29.)

"Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (N.J. 2005). A breach of the implied covenant of good faith and fair dealing differs from a "literal violation of a contract*," see Bak–A–Lum Corp. v. Alcoa Building Prods.*, 69 N.J. 123, 130 (N.J. 1976); hence, a party "may breach the implied covenant even though [its] performance does not violate a pertinent express term." *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244 (N.J. 2001), citing *Sons of Thunder, Inc. v. Borden,* 148 N.J. 396, 419 (N.J. 1997).

As the New Jersey Supreme Court has recognized, "[g]ood faith is a concept that defies precise definition." *Brunswick Hills*, 182 N.J. at 224. "Good

faith conduct is conduct that does not 'violate community standards of decency, fairness or reasonableness.'" *Id.*, quoting *Wilson*, 168 N.J. at 245. There are "myriad forms of conduct that may constitute violation of the covenant of good faith and fair dealing," and "[e]ach case is fact-sensitive." *Brunswick Hills*, supra at 225. However, "[p]roof of 'bad motive or intention' is vital to an action for breach of the covenant." *Id.*, quoting *Wilson*, supra at 251.

In its motion for judgment on the pleadings, Ameritas argues that Wilmington's claim for breach of the covenant of good faith and fair dealing is simply a "repackaged" breach of contract claim and therefore cannot be sustained. (Mot. 13-14.) Ameritas points to several New Jersey court decisions that stand for the proposition that a party may not maintain a separate cause of action for breach of the implied covenant of good faith and fair dealing where it would be duplicative of a breach of contract claim.

I agree with Ameritas that the assertion that Ameritas has filed an unsupported complaint as a means to hinder Wilmington's receipt of its contractual benefits is so closely akin as to be indistinguishable from a breach of contract claim. In essence, Wilmington takes issue with Ameritas's decision to initiate this action rather than pay Wilmington the benefits that are owed under the contract, assuming the policy is valid. Thus, to the extent that Wilmington grounds its counterclaim for breach of the implied covenant in Ameritas's initiation of a baseless lawsuit, the claim has not been adequately alleged.

By contrast, Wilmington has succeeded in stating a claim for breach of the implied covenant based on its assertion that, for years, Ameritas conveniently ignored facts indicating that the policy may have been procured by strangers, while continuing to collect hefty premiums on the policy. Such behavior is not consistent with "community standards of decency, fairness or reasonableness," *see Wilson*, 168 N.J. at 245, and is motivated by a desire to get the benefit of a bargain without giving anything in return. *See Bak–A–Lum Corp.*, 69 N.J. at 126–27, 129–30 (1976) (applying covenant of good faith and

16

fair dealing to termination of at-will exclusive distributorship in which defendant intentionally misled and caused harm to plaintiff). Or so it is alleged. Accordingly, the motion for judgment on the pleadings is denied as to counterclaim Count II.

### iv.  Bad faith denial of insurance proceeds

Wilmington's counterclaim for bad faith denial of insurance proceeds (Count V) mirrors the affirmative defense it asserts on this ground. Thus, for the same reason that I am striking the affirmative defense, I will grant Ameritas's motion for judgment on the pleadings as to the counterclaim for bad faith denial of insurance proceeds.

Wilmington alleges that "Ameritas's refusal to pay death benefits was not based on any good-faith belief that the Policy was void," but rather, "was a transparent reaction to what it views as favorable caselaw in New Jersey relating to STOLI transactions." (Ans. ¶50.) Yet even assuming that Ameritas has acted in bad faith by initiating this lawsuit without any reasonable grounds to do so, Wilmington has not adequately alleged that Ameritas has indeed "refused" to pay the death benefits requested. Wilmington treats the filing of a complaint for declaratory relief as an outright refusal to pay the claim, but the two are not equivalent. Wilmington therefore has not stated a claim for bad faith denial of insurance proceeds.

### v.  Promissory estoppel

To support its counterclaim for promissory estoppel, Wilmington alleges that Ameritas repeatedly represented to Wilmington that if Wilmington made timely premium payments, Ameritas would consider the policy to be valid and in force and would not contest the policy beyond the two-year contestability period. (Ans. ¶54.) Wilmington states that these representations were made in the policy itself, as well as in premium notices, annual policy statements, policy illustrations, and verifications of coverage. (Ans. ¶54.) Wilmington further alleges that Geronta relied on these representations in deciding to acquire the policy from its previous owner, and that both Geronta and

Wilmington relied on them in continuing to pay the premiums that became due. (Ans. ¶55.) As a result, Geronta and Wilmington have suffered damages.

To sustain a claim for promissory estoppel, a party must allege that (1) a clear and definite promise was made (2) with the expectation that the promise would rely on it, and (3) the promisee reasonably relied on it (4) to the promisee's substantial detriment. *See Sync Labs LLC v. Fusion Manufacturing*, No. 11-3671, 2016 WL 6802479, at *12 (D.N.J Nov. 16, 2016). Ameritas does not argue that these elements have not been met, but instead contends that the claim fails for the same reason that Wilmington's affirmative defenses of unclean hands, waiver, equitable estoppel, and laches fail—it seeks to enforce a policy irrespective of its illegality. (Mot. 9.) Wilmington maintains, however, that it is not seeking to enforce a void policy, but to hold Ameritas liable for promises it made before Geronta purchased the policy and for years afterward. (Opp. 30.)

In *Goldfarb v. Solimine*, 245 N.J. 326 (2021), the New Jersey Supreme Court discussed the distinction between promissory estoppel and breach of contract claims in the context of a suit against an employer who reneged on a promise of employment after the plaintiff had quit his job to accept the promised position. Although New Jersey law barred a breach of contract claim because it required a written employment contract, and the employment promises were verbal, the court allowed the promissory estoppel claim to proceed, noting that it is not based on "the contract," but rather, on the broken promise made by the defendant. *See id.* at 330.

The Court explained that "[s]uits to enforce contracts and suits predicated upon promissory estoppel are . . . different in both their requisite elements and their goals." *Id.* at 341. "The traditional remedy for breach of contract is expectation damages;" thus, by filing a breach of contract claim, a plaintiff seeks to obtain what he would have obtained had the defendant complied with his contractual obligations. *See id.* at 330-31. This is sometimes referred to as "the benefit of the bargain." *See id.* at 330-31, 339. A promissory

18

estoppel claim, on the other hand, is often backward-looking. *See id.* at 331. It "provides equitable relief to restore a plaintiff to the position he would have been in, had the relied-upon promise not been made and later broken." *Id.* In this sense, the relief is "designed to deter individuals who make promises with the intent that others rely on them and thereafter seek to avoid the consequences of that reliance when the promise is broken." *Id.*

To the extent that Wilmington is seeking reliance damages on its promissory estoppel counterclaim, the claim may go forward. Wilmington has sufficiently alleged that Ameritas made certain promises, and that Wilmington's and Geronta's reliance on these promises have substantially damaged them. Promissory estoppel is therefore an appropriate means, not to enforce the policy, but to restore Wilmington and Geronta to the positions they would have been in had the promises never been made and relied on. Accordingly, the motion for judgment on the pleadings will be denied as to counterclaim Count VI. *See Sun Life Assurance Co. Canada v. U.S. Bank Nat'l Ass'n*, No. 17-75-LPS, 2019 WL 2151695, at *5–7 (D. Del. May 17, 2019) (denying summary judgment as to claim for promissory estoppel against insurer that issued alleged STOLI policy).

### vi.   Negligent misrepresentation

As its final counterclaim, Wilmington alleges that Ameritas negligently misrepresented (Count VII) to Geronta and Wilmington that the policy was valid and in-force. (Ans. ¶58-59.) Wilmington asserts that "Ameritas did nothing to determine the accuracy of those statements either at policy issuance or any time thereafter over the next twelve years," and that Geronta relied on the misrepresentations in acquiring the policy and continuing to pay its premiums. (Ans. ¶60.)

To establish a claim of negligent misrepresentation under New Jersey law, a claimant must plausibly allege that (1) the opposing party negligently made an incorrect statement; (2) the claimant justifiably relied on the opposing party's statement; and (3) the claimant was injured as a consequence of relying

upon that statement. *See Carroll v. Cellco Partnership*, 713 A.2d 509, 516 (N.J. Super. Ct. App. Div. 1998). Ameritas argues that Wilmington "cannot point to any statements that were actionably false at the time of their making relating to the Policy's 'validity and in-force nature.'" (Mot. 35.) Ameritas maintains that the New Jersey Supreme Court did not declare STOLI policies illegal until the *Sun Life* decision was issued on June 4, 2019—several months after Sarn had died and only shortly before Wilmington submitted its claim for death benefits. (Mot. 36.) Because Wilmington has not identified any statements made by Ameritas about the policy's validity after *Sun Life* was decided, Ameritas argues that the negligent misrepresentation claim must fail.

Wilmington responds that "*Sun Life* did not change the law on STOLI." (Opp. 29.) That is plainly an overstatement, but there is truth in it. True, *Sun Life* was the first time that the New Jersey Supreme Court addressed the issue of STOLI policies. *See Sun Life*, 238 N.J. at 160 ("We now consider STOLI policies as a matter of first impression.") But it was not the first time that the legality of STOLI policies under New Jersey law had been analyzed by a court. Such policies had been at the center of a large debate between the insurance industry and investment speculators that had been brewing for over a decade before *Sun Life*. For its part, this district court weighed in on the controversy in two cases decided in 2009 and 2010. *See Calhoun*, 596 F.Supp.2d at 888-890; *Schwarz*, 2010 WL 3283550, at *5-9.

In *Calhoun*, Lincoln National Life Insurance Company sought recission of a $3 million policy owned by a family trust on the ground that the policy was procured with the intent to sell it to stranger investors, and that the policy therefore violated New Jersey's insurable interest requirement. *See* 596 F.Supp.2d at 884. Although the New Jersey Supreme Court had not yet settled the issue, this court denied the defendant trust's motion to dismiss the rescission claim in light of the compelling policy considerations raised. See *id.* at 890.

In *Schwarz*, which involved a similar set of facts as *Calhoun*, this court took a more definitive stance. The court first opined that it found "support for Plaintiff's position that these types of 'wager' arrangements should not be enforced in New Jersey because of the state courts' strong distaste for contracts that are contrary to public policy." *See* 2010 WL 3283550, at *7. The court then proceeded to discuss a survey of cases from other state and federal courts, which demonstrated that "the majority view is that life insurance contracts that lack a person with an insurable interest at inception are akin to wagering contracts, and therefore void *ab initio*." *Id.* at 8. The court concluded that the New Jersey Supreme Court would likely align with the majority view and hold that the STOLI arrangement at issue was "akin to a wagering contract, and therefore, void *ab initio*." *Id.* The court, perhaps wagering a bit itself, made an "*Erie* guess" that paid off.

As *Calhoun* and *Schwarz* illustrate, the legality of STOLI policies in New Jersey was questionable long before *Sun Life* was decided. That being the case, it is not a stretch to label the statements that Ameritas allegedly made about the validity of the policy "incorrect," even though those statements were made between September 2015, when Geronta first acquired the policy, and March 2019, when Sarn died. Should the case proceed to trial, Wilmington will have to prove that it was justified in relying on Ameritas's representations, which may be difficult to do in light of the near certainty that Wilmington itself was no less aware of the precariousness of STOLI policies under New Jersey law. At this stage, however, Wilmington has plausibly alleged that it is entitled to relief on its negligent misrepresentation counterclaim. I will therefore deny the motion for judgment on the pleadings as to counterclaim Count VII.

## IV.    Conclusion

For the reasons set forth above, Ameritas's motion to strike is **GRANTED** and its motion for partial judgement on the pleadings is **GRANTED** in part and **DENIED** in part. Specifically, the motion for judgment on the pleadings is **GRANTED** as to counterclaim Count I (declaratory relief) to the extent that it

seeks a declaration that Ameritas is precluded from contesting the validity of the policy under the incontestability clause, as well as a declaration that Ameritas is estopped from contesting the validity of the policy in light of various representations, demands, and promises. The motion for judgment on the pleadings is also **GRANTED** as to counterclaims Count III (breach of contract) and Count V (bad faith denial of insurance proceeds). The motion for judgment on the pleadings is **DENIED** as to counterclaims Count II (breach of the covenant of good faith and fair dealing), Count VI (promissory estoppel), and Count VII (negligent misrepresentation.) A separate order will issue.

Dated:  September 30, 2022

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**